Joshua B. Swigart (SBN 225557)
Josh@SwigartLawGroup.com
**SWIGART LAW GROUP, APC**
2221 Camino del Rio S, Ste 308
San Diego, CA  92108
P: 866-219-3343

Daniel G. Shay (SBN 250548)
DanielShay@TCPAFDCPA.com
**LAW OFFICE OF DANIEL G. SHAY**
2221 Camino del Rio S, Ste 308
San Diego, CA  92108
P: 619-222-7429

*Attorneys for Plaintiff
and The Putative Class*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY MOORE, JR., individually and on behalf of others similarly situated,<br><br>               Plaintiff,<br><br>vs.<br><br><br>CARHARTT, INC.,<br><br>               Defendant. | Case No: 3:23-CV-00145-L-DEB<br><br><u>CLASS ACTION</u><br><br>FIRST AMENDED COMPLAINT FOR DAMAGES FOR VIOLATIONS OF:<br><br>THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PEN. CODE § 631;<br><br>THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PEN. CODE § 632.7<br><br>JURY TRIAL DEMANDED |

Amended Class Action Complaint

**INTRODUCTION**

1.      Gregory Moore, Jr. ("Plaintiff"), individually and on behalf of all other similarly situated consumers ("Class Members"), brings this action for damages and injunctive relief against Carhartt, Inc. ("Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, related entities for violations of the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code §§ 631 and 632.7, in relation to its aiding in the unauthorized tapping and recording of Plaintiff's and Class Members' communications on their cell phones.

2.      Defendant did this through the use of "session replay" spyware that allowed Defendant's co-conspirator, Quantum Metric ("Quantum"), to tap, read, learn the contents of, record, use, disclose, analyze and make reports on Plaintiff's and Class Members' interactions on Defendant's website when they were browsing it on their cell phones.

3.      The California State Legislature passed CIPA to protect the privacy rights of the people of California. CIPA is very clear in its prohibition against aiding in the unauthorized tapping or learning the contents of communications:

> "Any person who, by means of any machine, instrument, or contrivance, or any other matter, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable. Or instrument of any internal telephonic communication system, or who willfully and without consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who **aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section" [violates this section]." <u>Cal. Penal Code § 631(a)</u> (emphasis added)

///
///

Amended Class Action Complaint

4.     CIPA also prohibits recording cellular communications without the consent of all parties:

> "Every person who, without the consent of all parties to a communication, intercepts or receives and intentionally records, or assists in the interception or reception and intentional recordation of, a communication transmitted between two cellular radio telephones, a cellular radio telephone and a landline telephone, two cordless telephones, a cordless telephone and a landline telephone, or a cordless telephone and a cellular radio telephone, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in a county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment.  If the person has been convicted previously of a violation of this section or of Section 631 , 632, 632.5, 632.6, or 636, the person shall be punished by a fine not exceeding ten thousand dollars ($10,000), by imprisonment in a county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment." Cal. Penal Code § 632.7(a)

5.     Plaintiff brings this action for violation of California Penal Code §§ 631 and 632.7 which both have a private right of action providing for statutory damages of $5,000 for each violation under Cal. Pen. Code § 637.2(a)(1).

6.     As discussed in detail below, Defendant's co-conspirator, Quantum utilized session replay spyware to tap and record Plaintiff's and Class Members' electronic communications without their knowledge or consent.

7.     Defendant embedded JavaScript computer code written by Quantum in the HTML code of Defendant's website.  Every time someone visits Defendant's website, the script deploys onto their cell phone for the purpose of watching and recording their interactions with Defendant's site.

8.     The spyware is active on Defendant's entire website, not just a page or two. The spyware gave Defendant and Quantum a record of Plaintiff's interactions on Defendant's entire website including the checkout pages.

9.     The spyware began doing its job the moment Plaintiff and Class Members visited Defendant's website.  Its use by Defendant allowed Quantum to tap, read, record, and learn the contents of Plaintiff's and Class Members' interactions with Defendant's

Amended Class Action Complaint

website immediately, including how Plaintiff and Class Members moved around the site, mouse movements and clicks, keystrokes, search terms, other words and text typed, all information inputted into the website, and pages and content viewed while visiting the website.

10.    Defendant's co-conspirator, Quantum, intentionally tapped and made unauthorized connections to Plaintiff's and Class Members' electronic communications to read and understand the information input on the site and movement around the site, as well as everything Plaintiff and Class Members did on those pages.

11.    After tapping Plaintiff's and Class Members' communications, Quantum used those communications to view in real-time the users' entire visits to Defendant's website. The surreptitious tapping, recording, and review of Plaintiff's and Class Members' communications is the electronic equivalent of looking over the shoulder of each visitor to the website.

12.    Quantum then collected, analyzed, used and disclosed the data it gained for its own business purposes.[1]

13.    With the aid of Defendant, Quantum made these unauthorized connections and recordings without the knowledge or consent of Plaintiff or Class Members.

14.    Any alleged consent occurred well after the tapping, monitoring and recording began.  The spyware becomes active instantaneously upon visiting the site. Even if Plaintiff later consented to its use, it would have occurred well after the fact. Such was the case in *Javier v. Assurance IQ, LLC* where the Ninth Circuit rejected retroactive consent for recording website users.  *Javier v. Assurance IQ, LLC*, DC No. 4:20-cv-02860-JSW

15.    "Technological advances[,]" such as Defendant's use of session replay technology, "provide 'access to a category of information otherwise unknowable' and 'implicate privacy concerns' in a manner different from traditional intrusions as a 'ride

---

[1] https://iam.quantummetric.com/terms-and-conditions

Amended Class Action Complaint

on horseback' is different from a 'flight to the moon.'" *Patel v. Facebook, Inc.,* 932 F.3d 1264, 1273 (9th Cir. 2019) (quoting *Riley v. California*, 573 U.S. 373, 393 (2014)).

16.     Jonathan Cherki, the CEO of Contentsquare which is a major "session replay" spyware company – while discussing its acquisition of Clicktale – publicly exposed why companies like Defendant engage in learning the contents of visits to their websites: "The combination of Clicktale and Contentsquare heralds an unprecedented goldmine of digital data that enables companies to interpret and predict the impact of any digital element – including user experience, content, price, reviews and product – on visitor behavior[.]"[2]

17.     Mr. Cherki added that "this unique data can be used to activate custom digital experiences in the moment via an ecosystem of over 50 martech partners. With a global community of customer and partners, we are accelerating the interpretation of human behavior online and shaping a future of addictive customer experience."[3]

18.     Unlike typical website analytics services that provide aggregate statistics, the session replay technology utilized by Defendant and Quantum is intended to record and playback individual browsing sessions as if someone is looking over the browser's shoulder with a video camera. The technology permits companies to view the interactions in live, real-time in addition to recording them.

19.     The extent and detail collected by the technology far exceeds consumers' expectations when visiting websites like Defendant's. The technology not only allows the tapping of a visitor's electronic communications with the website, but also allows Defendant and Quantum to create a detailed profile for each visitor to the site.

20.     Moreover, the collection of text entered, such as passwords and credit card numbers, allows sensitive personal information displayed on pages to be shared with others. This exposes visitors to potential identity theft, online scams, and other

---

[2] https://www.prnewswire.com/news-releases/contentsquare-acquires-clicktale-to-create-the-definitive-global-leader-in-experience-analytics-300878232.html
[3] *Id*

Amended Class Action Complaint

unwanted behavior.

21.    In 2019, Apple warned application developers using "session replay" technology that they were required to disclose such action to their users, or face being immediately removed from the Apple Store: "Protecting user privacy is paramount in the Apple ecosystem. Our App Store Review Guidelines require that apps request explicit user consent and provide a clear visual indication when recording, logging, or otherwise making a record of user activity."[4]

22.    This is what Defendant and Quantum should have done.  They should have immediately informed Plaintiff and Class Members with a pop-up window that their website visits were being recorded and required "explicit user consent" and provided "a clear visual indication when recording, logging, or otherwise making a record of user activity."

23.    Consistent with Apple's concerns, countless articles have been written about the privacy implications of recording user interactions during a visit to a website, including:

(a) *The Dark Side of 'Replay Sessions' That Record Your Every Move Online*, located at https://www.wired.com/story/the-dark-side-of-replay-sessions-that-record-your-every-move-online/.

(b) *Session-Replay Scripts Disrupt Online Privacy in a Big Way*, located at https://www.techrepublic.com/article/session-replay-scripts-are-disrupting-online-privacy-in-a-big-way/;

(c) *Are Session Recording Tools a Risk to Internet Privacy?* located at https://mopinion.com/are-session-recording-tools-a-risk-to-internet-privacy/

(d) *Session Replay is a Major Threat to Privacy on the Web*, located at https://www.itnews.com.au/news/session-replay-is-a-major-threat-to-privacy-on-the-web-477720;

---

[4] https://techcrunch.com/2019/02/07/apple-glassbox-apps/

(e) ***Popular Websites Record Every Keystroke You Make and Put Personal Information and Risk***, located at https://medium.com/stronger-content/popular-websites-record-every-keystroke-you-make-and-put-personal-information-at-risk-c5e95dfda514; and

(f) ***Website Owners can Monitor Your Every Scroll and Click***, located at https://www.digitalinformationworld.com/2020/02/top-brands-and-websites-can-monitor-your-every-scroll-and-click.html

24.     In sum, Defendant and Quantum illegally tapped, made unauthorized connections to, read or learned the contents or meaning of Plaintiff's and Class Members' electronic communications, and recorded those communications. Defendant infringed upon Plaintiff's and Class Members' privacy rights codified in CIPA.

25.     All unlawful conduct alleged herein took place in California and all violations by Defendant were knowing, willful, and intentional.

26.     The use of Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of Defendant.

### PARTIES

27.     Plaintiff is a natural person and resident of the State of California and the County of San Diego.

28.     Defendant is a Michigan entity with its principal place of business located in Michigan.

29.     At all times relevant herein Defendant conducted business in the State of California, in the County of San Diego, within this judicial district.

### JURISDICTION & VENUE

30.     This Court has federal subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because Plaintiff is a resident of California and seeks relief on behalf of California classes, which will result in all Class Member belonging to a different state than Defendant who is a Michigan entity

Amended Class Action Complaint

with its principal place of business in Michigan.

31.     Plaintiff is requesting statutory damages of $5,000 per violation of Cal. Pen. Code §631 and 632.7, which when aggregated among a proposed class number in the hundreds of thousands, far exceeds the $5,000,000 threshold for federal court jurisdiction under CAFA.

32.     Therefore, both diversity jurisdiction and the damages threshold under CAFA are present, and this Court has federal subject matter jurisdiction.

33.     This Court has personal jurisdiction over Defendant because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in California. The privacy violations complained of herein resulted from Defendant's purposeful and tortious acts directed towards citizens of California, such as Plaintiff, while they were located within California. At all relevant times, Defendant did business over the internet with residents of California and entered into contracts with residents of California. Defendant knew that its practices would directly result in real-time viewing and collection of information from California citizens while those citizens were engaged in commercial activity on Defendant's website. Defendant chose to benefit from marketing and doing business in California. It then viewed real-time data from the website visits initiated by Californians while located in California.  The claims alleged herein arise from those activities.

34.     Defendant also knows that many users visit and interact with Defendant's website while they are physically present in California. Many Californians purchase items on Defendant's site and enter their California addresses.  Another way Defendant knows a consumer is located in California is through location-determining tools that track and analyze users' IP addresses, without requiring the user to manually input a physical address. The employment of automatic location services in this way means that Defendant is continuously aware that its website is being visited by people located in California to buy Defendant's products in California, and that such website visitors are being tapped and recorded in violation of California statutory law, causing privacy harm

Amended Class Action Complaint

to California citizens.

35.    In addition, Defendant included California-specific provisions in its privacy policy in recognition that California citizens would be using Defendant's website while in California and that such use, as well as Defendant's own conduct, was subject to California law.[5]

36.    Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the conduct complained of herein occurred within this judicial district; and (ii) Defendant conducted business within this judicial district at all times relevant.

### FACTUAL ALLEGATIONS

37.    Defendant owns and operates the following website: www.carhartt.com.

38.    Over the past year, Plaintiff and Class Members visited Defendant's website from cell phones to shop for products.

39.    Plaintiff and Class Members were in California during each visit to Defendant's website.

40.    As soon as Defendant's site loaded on Plaintiff's cell phone, Plaintiff's phone began sending and receiving electronic communications in the form of instructions to and from Defendant's computer servers utilized to operate its website. The commands were sent as messages indicating to Defendant what words and text were typed, any search terms entered, and what content was being clicked, requested, and inputted by Plaintiff including any products ordered to be delivered to Plaintiff's home in California.

41.    By using the spyware, Defendant and Quantum were able to learn much more about Plaintiff and Class Members including the pages and content they viewed, their scroll movements, words and text typed even if not fully entered, copy and paste actions, any search terms (even if not fully entered), mouse clicks and movements, keystrokes, and all other information related to the visit.

---

[5] https://www.carhartt.com/privacy-policy

42.     Defendant responded to Plaintiff's and Class Members' electronic communications by supplying – through its website – the information requested by Plaintiff and Class Members. *Revitch v. New Moosejaw, LLC,* U.S. Dist. LEXIS 186955, at *3 (N.D. Cal. 2019) ("This series of requests and responses – whether online or over the phone – is communication.").

43.     Defendant and Quantum used session replay software which enabled them to see the screens of Plaintiff and Class Members while they were on Defendant's website.

44.     The "sessions" were tapped, recorded, and shared with or by, Quantum and possibly other third-party vendors conspiring with Defendant or Quantum.

45.     Defendant continuously operates at least one "session replay" JavaScript in its HTML code in partnership with the script's provider, Quantum, or another provider.

46.     Defendant installed Quantum's session replay spyware onto its servers and inserted the JavaScript into the HTML code of its website.

47.     When consumers visit Defendant's website, the JavaScript immediately loads onto their cell phones, from Defendant's site, and is stored in their phone's cache or temporary internet files.

48.     Like a parasite or a virus, the spyware then monitors and records communications the phone sends to, and receives from, Defendant's servers while the consumer browses Defendant's site.

49.     The communications are still allowed to travel their normal path between the consumer's phone and Defendant's servers, but the communications are tapped and copied and sent to Quantum's servers as well.  Like traditional wiretapping, the communication still goes through, despite the tapping and recording.  The consumer is completely unaware of what is happening.

50.     While browsing Defendant's site, Plaintiff's browser sent "GET requests" to Defendant's server.  The server responded by sending HTML code to Plaintiff's

Amended Class Action Complaint

browser.  The browser interpreted the code to allow the website to appear on Plaintiff's screen.  Defendant's code also included JavaScript that told  Plaintiff's browser to send another GET request to Quantum's server.  That server responded by sending its own code to Plaintiff's browser.  Once Plaintiff's browser loaded the code from Quantum, two things happened.  First, the code placed cookies on Plaintiff's browser so that Plaintiff's activity on the webpage had an associated visitor ID.  Second, the code told Plaintiff's browser to begin sending information to Quantum as Plaintiff navigated through Defendant's website, such as communicating that Plaintiff had searched for certain items.  Quantum could later use this information to identify which of Defendant's customers may be receptive to promotions.  *Popa v. Harriet Carter Gifts Inc.*, No. 21-2203 (3d Cir. 2022) describing the software.

51.   Quantum was continuously involved in the tapping and recording. Defendant did not simply purchase the spyware from Quantum and use it without any involvement from Quantum, which would be the case with a traditional tape recorder. Defendant licensed the software service from Quantum and agreed to be bound by its terms of use.[6]

52.   Quantum played an active role in the use of its spyware by (1) creating and licensing the JavaScript to Defendant who inserted it into its HTML code (2) causing the  JavaScript to download onto Plaintiff's phone when Plaintiff visited Defendant's site (3) using the script to tap and learn the contents of Plaintiff's communications to and from Defendant's site (4) sending copies of the communications to Quantum's servers (5) allowing Defendant, and potentially others, to access the sessions real time or later (6) collecting, analyzing, using and disclosing the data it gained for its own business purposes as shown in its Terms and Conditions.[7]

53.   This was all done at the direction of Defendant who procured Quantum to tap and record the communications.  The acts were done with the aid and agreement of

---

[6] https://iam.quantummetric.com/terms-and-conditions
[7] https://iam.quantummetric.com/terms-and-conditions

Amended Class Action Complaint

Defendant in conspiracy with the Quantum.

54.     Plaintiff and Class Members reasonably expected that visits to Defendant's website would be private and that neither Defendant nor Quantum would be recording their communications.

55.     Plaintiff and Class Members had no idea that Quantum would be tapping, connecting to, or otherwise attempting to understand their communications with Defendant's website.  Defendant failed to present a pop-up disclosure or consent form alerting them that the visits were monitored and recorded by Quantum or Defendant at the time the site loaded onto their phone.

56.     On March 18, 2021, Defendant updated its "WEBSITE PRIVACY POLICY" ("Effective Policy").[8]

57.     In the Effective Policy, Defendant did not disclose that Defendant and Quantum were capturing Plaintiff's and Class Members' mouse movements, keystrokes, scroll movements, and copy and paste actions.

58.     That Effective Policy did admit the use of "cookies, beacons, pixel tags, mobile ad identifiers and similar technology" and gathering "browsing history, search history, and information regarding your interaction with websites, applications or advertisements" - but that is not enough.  It does not disclose that Class Members' screens will be recorded.

59.     The Effective Policy only says it records phone calls, not website communications.

60.     The Effective Policy  does not mention "Quantum" or "session replay" or anything to that effect.  It certainly did not inform Plaintiff or Class members that Quantum will "collect and analyze" their data and "use such information and data" and "disclose" it.[9]

---

[8] https://web.archive.org/web/20221225111654/https://www.carhartt.com/privacy-policy

[9] https://iam.quantummetric.com/terms-and-conditions

Amended Class Action Complaint

61. On January 26, 2023, Plaintiff filed the original complaint in this case.

62. On February 16, 2023, Defendant updated its Privacy and Security Statement, yet it still does not mention "Quantum" or "session replay" or anything to that effect. It still does not inform consumers that Quantum will "collect and analyze" their data and "use such information and data" and "disclose" it.

63. Any alleged consent was obtained after the fact. The spyware loads immediately when visiting the site. Even if Plaintiff or Class Members subsequently consented to its use, it would have been afterward. The Ninth Circuit addressed this issue in *Javier v. Assurance IQ, LLC* where it rejected retroactive consent for recording website users. *Javier v. Assurance IQ, LLC*, DC No. 4:20-cv-02860-JSW

64. Plaintiff and Class Members reasonably believed their interactions with Defendant's website were private and would not be recorded or monitored for later playback or monitored live while they were on its website.

65. Neither Defendant nor Quantum are providers of wire or electronic communication services or are internet service providers.

66. The use of session play spyware was not instrumental or necessary to the operation or function of Defendant's website or business.

67. The use of session replay spyware to tap Plaintiff's electronic communications was not instrumental to Defendant's provision of any of its services. Rather, the level and detail of information surreptitiously collected by Defendant and Quantum indicates that the only purpose was to gain an unlawful understanding of the habits and preferences of users of its website, and the information collected was solely for the benefit of Defendant and Quantum.

68. Defendant's use of session replay spyware to aid in the tapping and understanding of electronic communications did not facilitate, was not instrumental, and was not incidental to the transmission of the electronic communications.

69. Defendant and Quantum utilized the session replay spyware to learn and understand the meaning of Class Members' electronic communications with

13

Defendant's website, intentionally and contemporaneously, including any credit card numbers entered, CVV codes, billing zip codes, first names, last names, phone numbers, addresses, email addresses, mouse clicks and movements, keystrokes, search terms, words and text typed, information input, pages and content viewed, scroll movements, and copy and paste actions.

70.     The relevant facts regarding the full parameters of the communications Defendant aided Quantum to tap, learn and understand, and the extent of how the connections occurred are solely within the possession and control of Defendant and Quantum.

71.     The session replay spyware utilized by Defendant is not a website cookie, standard analytics tool, web beacon, or other similar technology.

72.     Unlike harmless collection of an internet protocol address, the data collected by Defendant and Quantum identified specific information input and content viewed, and thus revealed personalized and sensitive information about Plaintiff's and Class Members' internet activity and habits.

73.     The electronic communications Defendant aided Quantum to tap consisted of content generated through Plaintiff's use, interaction, and communication with Defendant's website relating to the substance, purport, and meaning of Plaintiff's and Class Members' communications with the site including personal information entered.

74.     The electronic communications Defendant aided Quantum to read and understand were not generated automatically and were not incidental to other consumer communications.

75.     The spyware utilized by Defendant and Quantum allowed Quantum to learn the contents of communications in a manner that was undetectable.

76.     Defendant's spyware recorded Plaintiff's and Class Members' communications, then Defendant and Quantum analyzed the communications for business purposes.

77.     Defendant never sought consent, and Plaintiff and Class Members never

14

provided consent, for the unauthorized access, reading and recording of their electronic communications.

78.   Plaintiff and Class Members did not have a reasonable opportunity to discover the unlawful connections because Defendant did not disclose them or seek consent from Plaintiff or Class Members before it happened.

79.   As a software-as-a-service ("SaaS") company, Quantum provided "services" to Defendant as opposed to "goods" like tape recorders.

80.   Quantum used Plaintiff's communications for its own commercial benefit. The terms and conditions between Defendant and Quantum state;

> "Quantum shall have the right to collect and analyze data and other information relating to the provision, use and performance of various aspects of the Quantum Service and related systems and technologies (including, without limitation, information concerning Customer Data and data derived therefrom), and Quantum will be free (during and after the Term) to use such information and data to improve and enhance the Quantum Technology and for other development, diagnostic and corrective purposes in connection with the Quantum Service and other Quantum offerings, and to disclose such data solely in aggregate or other de-identified form in connection with its business."[10]

81.   Even if Quantum did not use the data for its own gain, it certainly had the capability to use it for its own gain and it could analyze and interpret the data.

82.   However, reading a use requirement into CIPA would add a requirement that is not present.  In *Ribas v. Clark,* the California Supreme Court did not consider the intentions or use to which the eavesdropper put the information obtained.  Instead, the court emphasized the privacy concerns at issue having an "unannounced second auditor" listening to the call, when Section 631 concerns the "right to control the nature and extent of the firsthand dissemination of [their] statements." *Ribas v. Clark*, 38 Cal. 3d at 360-361 (1985)

///

---

[10] https://iam.quantummetric.com/terms-and-conditions

Amended Class Action Complaint

83.     Plaintiff was completely unaware that Quantum was involved in any way and Plaintiff did not intend to communicate with Quantum.  Plaintiff has never heard of Quantum, which is a separate entity from Defendant operating on its own.

84.     Quantum's presence and involvement in the scheme was unknown to Plaintiff.   Quantum was a second entity that received Plaintiff's communications simultaneously, or even before, Defendant. "Such secret monitoring denies the speaker an important aspect of privacy of communication – the right to control the nature and extent of the firsthand dissemination of his statements" as the California Supreme Court held in *Ribas v. Clark*, 38 Cal. 3d at 361 (1985)

85.     For the "party exception" to apply under Cal. Penal Code § 631(a), the "consent of all parties to the communication" must be present as worded in Cal. Penal Code § 631(a).  Here, Quantum's involvement was kept secret, so Plaintiff was not aware of "all parties to the communication."

86.     After looking at the legislative intent of CIPA, The *Ribas* court held that Cal. Penal Code § 631 "was designed to protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call.   *Ribas v. Clark*, 38 Cal. 3d (1985) citing 57 Cal. L. Rev. at p. 1202, fn. 120

87.     Cal. Penal Code § 631(a) does not mention the word "intercept" and interception is not an element of Cal. Penal Code § 631(a).  But even if a violation did require interception, that requirement would be met here since Quantum acquired the communications and came into possession of them.

88.     It is not a requirement that the communications are tapped "in transit." Under CIPA 631, it is enough if the communications are "being sent from and received at a place within this state." *Ribas v. Clark*, 38 Cal. 3d (1985)

89.     Plaintiff alleges that the communications Plaintiff' phone sent to Defendant often arrived at Quantum's servers before they arrived at Defendant's servers, even if only by a millisecond.

16

90.     For unlawful recording under Cal. Penal Code § 632.7, which is also alleged here, there is no "party exception."  A party to the communication is liable for recording a communication without the consent of the other party as the California Supreme Court held in *Smith v. LoanMe Inc*., 11 Cal. 5th 183 (2021).

91.     In *Ribas v. Clark*, the California Supreme Court stated; "the Privacy Act has long been held to prevent one party to a conversation from recording it without the other's consent." (*People v. Wyrick* (1978) 77 Cal. App. 3d 903, 909 [144 Cal. Rptr. 38]; *Forest E. Olson, Inc. v. Superior Court* (1976) 63 Cal. App. 3d 188, 191 [133 Cal. Rptr. 573].)

**STANDING**

92.     Defendant's conduct constituted invasions of privacy because it disregarded Plaintiff's statutorily protected rights to privacy, in violation of CIPA.

93.     Defendant caused Plaintiff to (1) suffer invasions of legally protected interests. (2) The invasions were concrete because the injuries actually existed for Plaintiff and continue to exist every time Plaintiff visits Defendant's website. The privacy invasions suffered by Plaintiff and Class Members were real and not abstract. Plaintiff and Class Members have a statutory right to be free from tapping and recording of their communications. The tapping and recording were meant to secretly spy on Plaintiff to learn more about Plaintiff's behavior.  Plaintiff and Class Members were completely unaware they were being observed.  Plaintiffs' injuries were not divorced from concrete harm in that privacy has long been protected in the form of trespassing laws and the Fourth Amendment of the U.S. Constitution for example.  Like here, an unreasonable search may not cause actual physical injury, but is considered serious harm, nonetheless. (3) The injuries here were particularized because they affected Plaintiff in personal and individual ways. The injuries were individualized rather than collective since Plaintiff's unique communications were examined without consent during different website visits on separate occasions. (4) The past invasions were actual and future invasions are imminent and will occur next time Plaintiff visits Defendant's

17

website. Defendant and its co-conspirator continue to tap and record communications without consent. A favorable decision by this court would redress the injuries of Plaintiff and Class Members.

**TOLLING**

94.     Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know, and had no way of knowing, that Plaintiff's information was tapped and recorded by Quantum or Defendant, because Defendant kept this information secret.

**CLASS ACTION ALLEGATIONS**

95.     Plaintiff brings this lawsuit as a class action on behalf of Plaintiff and Class Members of putative Classes under F.R.C.P. 23.

96.     Plaintiff proposes the following Classes, consisting of and defined as follows:

> Class One (Cal. Penal Code § 631)
> All persons in California whose communications were tapped by a person Defendant aided, agreed with, employed, or conspired to tap.

> Class Two (Cal. Penal Code § 632.7)
> All persons in California whose cellular communications were recorded by Defendant, or an entity Defendant assisted.

97.     Excluded from each Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to redefine each Class and to add subclasses as appropriate based on discovery and specific theories of liability.

98.     **Numerosity**: The Class Members are so numerous that joinder of all members would be unfeasible and impractical. The membership of each Class is currently unknown to Plaintiff at this time; however, given that, on information and

18

belief, Defendant accessed millions of unique cell phones, it is reasonable to presume that the members of each Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

99.    **Commonality**: There are common questions of law and fact as to Class Members that predominate over questions affecting only individual members, including, but not limited to:

- Whether Defendant aided Quantum to tap communications with Class Members;
- Whether Defendant aided Quantum to read or learn the contents of communications with Class Members;
- Whether Defendant has a policy of aiding in the tapping or reading of communications of Class Members;
- Whether Defendant's policy or practice of aiding in the tapping or reading of Class Members communications constitutes a violation of Cal. Penal Code § 631;
- Whether Defendant recorded, or assisted Quantum to record, communications with Class Members;
- Whether Defendant has a policy of recording, or assisting Quantum to record, communications of Class Members;
- Whether Defendant's policy or practice of recording, or assisting Quantum to record, Class Members' communications constitutes a violation of Cal. Pen. Code § 632.7;
- Whether Class Members were aware of Defendant's session replay spyware and had consented to its use.

100.   **Typicality**: Plaintiff's and Class Members' electronic communications were tapped and recorded without their consent and the injuries are typical to all Class Members.

Amended Class Action Complaint

101.   Plaintiff and Class Members were harmed by the acts of Defendant in at least the following ways: Defendant's co-conspirator, illegally tapped and recorded Plaintiff and Class Members' electronic communications, and other sensitive personal data from their cell phones, and invaded the privacy of Plaintiff and Class Members.

102.   **Adequacy**: Plaintiff is qualified to, and will, fairly and adequately protect the interests of each Class Member with whom Plaintiff is similarly situated, as demonstrated herein.  Plaintiff acknowledges that Plaintiff has an obligation to make known to the Court any relationships, conflicts, or differences with any Class Member. Plaintiff's attorneys, the proposed class counsel, are well versed in the rules governing class action discovery, certification, and settlement.  In addition, Plaintiff's attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. The proposed class counsel is experienced in handling claims involving consumer actions and violations of CIPA.  Plaintiff has incurred, and throughout the duration of this action, will continue to incur costs that have been, are, and will be, necessarily expended for the prosecution of this action for the substantial benefit of each Class Member.  Plaintiff and proposed class counsel are ready and prepared for that burden.

103.   **Predominance**: The questions of law or fact in this case are common to all Class Members and predominate all their claims. The elements of the legal claims brought by Plaintiff and Class Members are capable of proof at trial through evidence that is common to each Class rather than individual to its members.

104.   **Superiority**: A class action is a superior method for the fair and efficient adjudication of this controversy because:

a.   Class-wide damages are essential to induce Defendant to comply with California law.

b.   Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct.

20

c.   Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

d.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

e.   Class action treatment is manageable because it will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would endanger.

f.   Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy.

105.   Plaintiff and Class Members have suffered, and will continue to suffer, harm and damages as a result of Defendant's unlawful and wrongful conduct.  A class action is superior to other available methods because as individual Class Members have no way of discovering that Defendant tapped and recorded Class Member's electronic communications without their knowledge or consent.

106.   Each Class may also be certified because:

- The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant;

- The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

Amended Class Action Complaint

- Defendant has acted, or refused to act, on grounds generally applicable to each Class, thereby making appropriate final and injunctive relief with respect to the members of each Class as a whole.

107.   This suit seeks only damages and injunctive relief for recovery of economic injury on behalf of Class Members and it expressly is not intended to request any recovery for personal injury and claims related thereto.

108.   The joinder of Class Members is impractical and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court.  The Class Members can be identified through Defendant's records.

### FIRST CAUSE OF ACTION
### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### CALIFORNIA PENAL CODE § 631

109.   To establish liability under section 631(a), a plaintiff need only establish that a defendant, or its co-conspirator, "by means of any machine, instrument, contrivance, or in any other manner" does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

110.   Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, --- F.3d --- 2020 WL 1807978 (9th Cir. Apr. 9, 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

111.   The session replay spyware constitutes a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

112.   By using the session replay spyware to tap, track, record, and attempt to learn the contents of Plaintiff's and California Class Members' electronic communications, Defendant intentionally aided in the tapping, electrotonically or otherwise, the lines of internet communication of Plaintiff and Class Members.

113.   By utilizing the session replay spyware, Defendant's co-conspirator willfully and without consent, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and putative California Class Members, while the electronic communications were in transit or passing over a wire, line or cable or were being sent from or received at a place in California with the aid of Defendant.

114.   Plaintiff and Class Members did not consent to any of Defendant's, or the Quantum's actions, in implementing these unauthorized connections, nor have Plaintiff or Class Members consented to Defendant's intentional access, interception, reading,

learning, and collection of Plaintiff's and California Class Members' electronic communications.

115. Defendant aided Quantum to tap Plaintiff's and California Class Members' electronic communications when they accessed Defendant's website from within the State of California.

116. Plaintiff and California Class Members did not know Quantum was engaging in such tapping and therefore could not provide consent to have any part of their electronic communications tapped.

117. Plaintiff and Class Members were completely unaware that Defendant had aided Quantum to tap or learn the contents of their electronic communications until well after the fact and were therefore unable to consent.

118. Neither Defendant nor Quantum advised Plaintiff or Class Members that any part of their electronic communications with Defendant's website would be tapped etc.

119. Defendant aided Quantum in tapping, connecting to, intercepting, accessing, taking and using Plaintiff's and the California Class Members' communications in violation of Cal. Penal Code § 631(a).

120. Defendant aided Quantum in willfully and without consent reading or learning the contents or meaning of Plaintiff and Class Members' communications while in transit or passing over a wire, line or cable in violation of Cal. Penal Code § 631(a).

121. Defendant aided Quantum in using, or attempting to use, or communicate the information it intercepted in violation of Cal. Penal Code § 631(a).

122. Defendant aided, agreed with, employed, or conspired to unlawfully do, or permit, or caused the unlawful acts above in violation of Cal. Penal Code § 631(a).

123. Plaintiff and Class Members are entitled to statutory damages of $5,000 per violation of Cal. Pen. Code § 631(a) pursuant to Cal. Pen. Code § 637.2(a)(1).

///

24

124. Plaintiff's counsel is entitled to attorneys' fees and costs under Cal. Code of Civ. Proc. § 1021.5.

## SECOND CAUSE OF ACTION
### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### CALIFORNIA PENAL CODE § 632.7

125. Defendant used session replay spyware to surreptitiously record the communications of Plaintiff and Class Member when they visited Defendant's website via their cell phones.

126. Defendant assisted Quantum to record the communications of Plaintiff and Class Members when they visited Defendant's website with their cell phones.

127. Defendant had a policy of not advising or warning Plaintiff and Class Members that it was using session replay spyware to record, or assist to record, their cellular communications with Defendant's website until after it happened.

128. Defendant did not obtain consent of Plaintiff and Class Members prior to the recording, or assisting in the recording, of their cellular communications.

129. Defendant's conduct violated Cal. Pen. Code § 632.7(a).

130. Plaintiff and Class Members are entitled to statutory damages of $5,000 per violation of Cal. Pen. Code § 632.7(a) pursuant to Cal. Pen. Code § 637.2(a)(1).

131. Plaintiff's counsel is entitled to attorneys' fees and costs under Cal. Code of Civ. Proc. § 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class Members pray that judgment be entered against Defendant, and that Plaintiff and Class Members be awarded the following:

- Certify the Classes as requested herein;
- Appoint Plaintiff to serve as the Class Representative for the Classes;
- Appoint Plaintiff's Counsel as Class Counsel in this matter;
- $5,000 per violation of Cal. Pen. Code §§ 631 and 632.7 to each Class Member pursuant to Cal. Pen. Code § 637.2(a)(1);

Amended Class Action Complaint

- Reasonable attorneys' fees pursuant to Cal. Code of Civ. Proc. § 1021.5;
- Injunctive relief to prevent the further violations of Cal. Pen. Code §§ 631, 632 and 632.7;
- An award of costs to Plaintiff; and
- Any other relief the Court may deem just and proper including interest.

### TRIAL BY JURY

132.   Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff and Class Members are entitled to, and demand, a trial by jury.

Respectfully submitted,

**SWIGART LAW GROUP**

Date:  April 28, 2023                          By:      _s/ Joshua Swigart_
Joshua B. Swigart, Esq.
Josh@SwigartLawGroup.com
Attorneys for Plaintiff

**LAW OFFICE OF DANIEL G. SHAY**

Date:  April 28, 2023                          By:      _s/ Daniel Shay_
Daniel G. Shay, Esq.
DanielShay@TCPAFDCPA.com
Attorney for Plaintiff

Amended Class Action Complaint